## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROBERT M. KOLETAR, JR.,** | : | **Civil No. 1:21-CV-994** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security[1],** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

### I.   Introduction

The claimant, Robert Koletar, Jr., brings this social security appeal asserting that the Administrative Law Judge (ALJ) who determined he was not disabled erred in a number of ways when evaluating his claim for disability benefits. Among other ailments, Koletar suffers from type 2 diabetes that has not been well controlled and nerve damage from a sudden onset of Guillain-Barre syndrome he suffered in 2018. These conditions have led to Koletar experiencing neuropathy, which primarily causes him pain and discomfort in his feet. Despite receiving treatment and physical

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g) Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

therapy, Koletar claims his symptoms have completely prevented him from returning to work after his position as a textiles manager was eliminated shortly before his diagnosis. Nonetheless, the ALJ determined that Koletar was capable of performing his past relevant work, as well as other work that exists in the national economy. Koletar challenges the ALJ's decision, arguing that the ALJ erred in finding the opinion of his treating physician not persuasive and in failing to include limitations related to the use of his hands when assessing his claim. He also argues the decision by the ALJ is wholly defective because appointment of Andrew Saul as the Commissioner of SSA violates the separation of powers doctrine.

For the reasons that follow, we find the ALJ's decision denying Koletar disability benefits was supported by substantial evidence and should be affirmed.

## II.   <u>Statement of Facts and of the Case</u>

On May 24, 2019, Robert Koletar, Jr. applied for disability and supplemental security insurance benefits, citing an array of physical impairments, including alcoholic cirrhosis of the liver, Guillain-Barre syndrome, type 2 diabetes, chronic insomnia, hiatal hernia, hyponatremia, gastroesophageal reflux disease with esophagitis, thrombocytopenia, anemia, and a frozen shoulder. (Tr. 80). Koletar was forty-nine years old at the time of the alleged onset of his disability, (<u>Id.</u>), and worked

as a Custom Wovens Manager at a textile company for over thirty years, until he indicated his job was eliminated in 2018. (Tr. 186-87).

With respect to these alleged impairments, the clinical record, medical opinions, and the plaintiff's activities of daily living revealed the following:

According to Koletar's testimony, in April of 2018 he began falling unexpectedly. (Tr. 44). His falls became more frequent and, as his condition worsened, he began using a walker and eventually became paralyzed from the waist down. (Id.) His medical records show that he went to the ER on June 20, 2018, where it was noted that he had reported several falls and general weakness with paresthesia in his feet. (Tr. 313). The ER notes also mention he had been diagnosed with type 2 diabetes which had been poorly controlled as well as alcoholic cirrhosis of the liver, hyponatremia, and hypertension. (Id.) He was admitted to the hospital for testing, (Tr. 319), and was eventually diagnosed with Guillain-Barre Syndrome (GBS). (Tr. 391). Koletar underwent plasma exchange for five days and, although it was initially recommended he receive inpatient rehabilitation, his discharge papers indicate he did better over time, and was ready to be discharged home on June 29, 2018. (Tr. 435). His discharge examination revealed active movement with full resistance in all extremities, but "modified dependence" in locomotion and mobility/ambulation. (Tr. 440).

3

After his discharge, Koletar had follow-up appointments with his primary care provider, endocrinologist, and neurologist. He saw his primary care provider, Dr. Thomas Hepner, for a follow-up on July 3rd, 2018. (Tr. 308). Dr. Hepner noted that Koletar indicated he was feeling good after his hospitalization, except for some nausea, and felt that his strength was getting better. (Tr. 308). He was seen again by a nurse practitioner on August 13th, 2018, and noted he was doing physical and occupational therapy but that, although he felt overall okay and felt he was slowly improving, he was frustrated by a lack of progress with mobility. (Tr. 293). He requested a prescription for a rolling walker and a handicap placard for parking. (Id.) His physical examination noted he was still weak and "chronically ill appearing" but in good spirits and even jovial. (Tr. 294).

Koletar also had two follow-up appointments in August of 2018 with an endocrinologist for his uncontrolled type 2 diabetes. (Tr. 286, 296). At both appointments his reported symptoms were blurred vision, numbness, tingling, and pain in his hands and feet, but no neuropathy. (Tr. 298). After his first appointment, his medications were adjusted, and he was instructed to track his blood glucose. (Tr. 300). Notes from his appointment in late August noted he had an unsteady gait and was using a walker. (Tr. 287).

On October 15, 2018, Koletar saw a neurologist to follow up on his Guillain-Barre syndrome. (Tr. 278-79). He reported that he was able to open bottles, walk with the use of a walker, and that the numbness in his hands and feet had improved. (Tr. 279). The neurologist reported that Koletar had responded extremely well to plasmapheresis therapy, demonstrated significant improvement in strength in all four extremities, and continued to see improvement with twice weekly physical and occupational therapy. (Tr. 284).

In the following months, Koletar's condition was mostly unremarkable. On November 12, 2018, Koletar reported that he was experiencing tightness in his hands and feet and that he felt he had stopped improving (Tr. 275). Dr. Hepner's examination revealed his condition was stable and recommended no changes in his current care plan for GBS. (Tr. 276). In March 2019 he reported joint pain in his left shoulder, that carrying a bag of groceries felt "like a stab," and that he was taking Aleve, but it was not always helping. (Tr. 268). A physical examination revealed mild decreased range of motion and tenderness but not crepitus or deformity and normal pulse and strength. (Tr. 269).

Koletar reported to his neurologist in April 2019 that he felt better than six months prior, but still only about 35% of his "normal" prior to the onset of his symptoms. He noted that his legs had improved but that his ankles were still a little

weak and his feet felt very sensitive and uncomfortable, with significant neuropathic pain. (Tr. 263). After examination, the neurologist noted Koletar continued to appear to be doing extremely well, demonstrating subtle signs of improvement compared with prior visits including return of his left patellar reflex as well as slightly better hip flexion strength bilaterally and intact strength, sensation, and reflexes in the upper extremities. (Tr. 267).  Koletar reported that he had not been to physical therapy since November of 2018 and that he did not feel additional physical therapy sessions would be helpful as his dog kept him active. (Tr. 263). He was prescribed Gabapentin for his neuropathic pain. (Tr. 267).

At a follow-up on his shoulder in late April 2019, Koletar was diagnosed with left shoulder adhesive capsulitis and mild acromioclavicular joint arthritis. (Tr. 261). Koletar received injections on May 17 and June 7, and by July 19, 2019, and afterwards he reported his shoulder pain had gone down to 1/10 and had increased range of motion. (Tr. 254, 257, 1140).

On October 11, 2019, Koletar's neurologist reported the Gabapentin helped his neuropathic pain significantly, although Koletar still reported having constant discomfort in the bottom so his feet that was usually more severe about two days per week. (Tr. 1144). Koletar also reported numbness and tingling in the tips of his fingers and random twitching of his fingers and toes, although he denied any issues

with dropping things. (Id.) Koletar denied any new weakness and reported he felt his thigh muscles had regained some strength since his prior visit. (Tr. 1145). An examination revealed a stable gait, though he was unable to perform tandem walking, intact sensation, and 5/5 strength in all extremities. (Tr. 1147). His Gabapentin dose was increased to maximize neuropathic pain control. (Tr. 1149). As of his visit with Dr. Hepner in December 2019, Koletar reported that he was still experiencing lower extremity neuropathy with pain at 3/10 and that he could not sit or stand too long. (Tr. 1198).

The record also includes RFC evaluations by three medical experts: State agency medical consultants, Dr. Sanjay Gandhi and Dr. Maas and treating physician Dr. Hepner. Based on his review of Koletar's medical records, Dr. Gandhi opined that Koletar had exertional limitations due to neuropathy, but could occasionally lift and/or carry 20 pounds and could frequently lift/carry 10 pounds, could stand/walk for a total of 6 hours in an 8-hour workday and could sit for a total of 6 hours in an 8-hour work day, had unlimited ability to push/pull in his left upper extremity and both lower extremities, could occasionally climb ramps/stairs but never climb ladders, ropes, or scaffolds, could frequently stoop, kneel, and crouch and occasionally balance and crawl. (Tr. 73-74). He noted that, due to his adhesive capsulitis and concern for Hill-Sachs lesion, Koletar was limited in reaching with

his left arm, including in front/laterally and overhead, but had no other manipulative limitations. (Tr. 74). Further, Dr. Gandhi noted that Koletar should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity and vibration and even moderate exposure to hazards such as machinery or heights, due to his high risk of injury due to falls and loss of sensory reflexes.(Tr. 75). Based on the record, Dr. Gandhi determined that Koletar was capable of performing light work and was not disabled. (Tr. 77-78).

Dr. Maas made similar observations to Dr. Gandhi, noting that Koletar would be limited in reaching overhead with his left arm due to left shoulder adhesive capsulitis, but that he had no other manipulative limitations, (Tr. 85), he should avoid concentrated exposure to extreme heat and cold, vibrations, fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery and heights due to his high risk for injuries as a result of falls and loss of sensory reflexes, (Tr. 85-86), and that he was capable of performing light work and was not disabled. (Tr. 88).

Conversely, Koletar's treating physician Dr. Hepner opined that Koletar was only able to stand/walk for less than 2 hours total in an 8-hour workday and could only stand for 15 minutes at one time but could sit more than two hours at one time and at least 6 hours total in an 8-hour workday. (Tr. 1248). He noted that Koletar could lift and carry up to 10 pounds frequently, occasionally 20 pounds, but never

50 pounds, and could rarely twist, stoop, crouch/squat. (Tr. 1249). According to Dr. Hepner, during an 8-hour workday, Koletar could use his hands 10% of the time, arms reaching in front of the body 50% of the time and overhead 10% of the time but could use his fingers for fine manipulations 0% of the time. (Tr. 1250). Dr. Hepner further opined that Koletar's continued neuropathy after Guillain-Barre syndrome, insomnia, and chronic fatigue would require him to take frequent unscheduled breaks of 5-10 minutes during a working day, (Tr. 1249), would likely cause him to be "off task" 25% or more of a typical workday and absent from work more than four days per month, and that he would be incapable of even "low stress" work. (Tr. 1250).

It is against the backdrop of this evidence that the ALJ conducted a hearing in Koletar's case on February 20, 2020.  Koletar and a vocational expert both testified at this hearing. Koletar testified that he was diagnosed with Guillain-Barre Syndrome (GBS) in 2018 and received five plasmapheresis treatments. (Tr. 46). He noted that, while the treatments slowed the progression of GBS, he continued to have nerve pain in his feet and tingling and weakness in his hands that make his activities of daily living difficult. (Tr. 46-49). He also noted that he injured his shoulder after a fall related to his GBS that made it difficult to lift anything over his head, although he noted he was no longer receiving treatment for that injury. (Tr. 47-48). The ALJ

and Koletar's attorney posed hypothetical to the vocational expert regarding whether there were any jobs in the national economy that could be performed by an individual with Koletar's residual function capacity and additional limitations. (Tr. 62-65).

Following this hearing on February 20, 2020, the ALJ issued a decision denying Koletar's application for benefits. (Tr. 13-25). In that decision, the ALJ first concluded that Koletar had not engaged in substantial gainful activity since June 10, 2018, the amended alleged onset date. (Tr. 18). The ALJ noted that the record showed earnings of $14,957 in the second quarter of 2018 and $3,335 in the third quarter of 2018 and that Koletar testified that he did not work but did receive a severance package from his employer. (Id.) He had no other earnings or work activity since the amended alleged onset date. (Id.). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Koletar had the following severe impairments: diabetes, neuropathy, adhesive capsulitis of the left shoulder, and Guillain-Barre syndrome. (Id.) The ALJ also determined that Koletar had several non-severe impairments, including a history of substance abuse issues, erectile dysfunction, and alcoholic liver cirrhosis. (Tr. 19). He found these impairments to be non-severe because there did not appear to be any work-related functional limitations relating to his erectile dysfunction, the claimant testified that he did not have any symptoms from the cirrhosis, and the record did not demonstrate

that these conditions caused any significant functional limitations or that they had lasted or were expected to last 12 months or more. (Id.) At Step 3, the ALJ determined that Koletar did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Park 404, Subpart P, Appendix 1.

Between Steps 3 and 4 the ALJ concluded that Koletar retained the following residual functional capacity:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he could occasionally push and/or pull with the left upper extremity, such as operating levers or hand controls and could occasionally operate pedals and foot controls. He could occasionally balance, crawl, use ramps and climb stairs, and frequently stoop, crouch. He must avoid climbing ladders, ropes or scaffolding. He could occasionally reach with the left upper extremity. He could tolerate only occasional exposure to extreme heat and cold vibrations. He must avoid workplace hazards such as unprotected heights and dangerous moving machinery.

(Tr. 20).

In reaching this RFC determination, the ALJ considered the medical evidence set forth above, the medical opinion evidence, and Koletar's statements regarding his limitations. With respect to the medical opinion evidence regarding the alleged physical impairments, the ALJ considered the opinions of Dr. Gandhi, Dr. Maas, and Dr. Hepner. The ALJ found the opinion of Dr. Gandhi partially persuasive but found

the opinion of Dr. Maas more persuasive with the reaching, push/pull limitations for

the left upper extremity and bilateral lower extremities. (Tr. 23). The ALJ also found

Dr. Maas' opinion more consistent with the clinical findings by treating physicians

Dr. Hepner and Dr. Lewis. (Id.) The ALJ found Koletar's treating physician, Dr.

Hepner's, opinion not persuasive, characterizing the limitations delineated by Dr.

Hepner to be "rather extreme" and inconsistent with the examination findings of the

longitudinal record. (Id.)

The ALJ also considered Koletar's statements regarding his limitations but

ultimately concluded that his statements were not entirely consistent with the

medical evidence. (Tr. 21). The ALJ noted that Koletar testified that he has difficulty

with lifting, squatting, reaching, walking, kneeling, and climbing stairs and that,

because he has no reflexes in his legs due to Guillain-Barre syndrome, he only drives

short distances. (Tr. 39). He stated his hands and toes had tingling in them about

three days a week and that some days he could not use a keyboard or write and had

difficulty holding things with his arms and hands but other times they're totally fine

and perfect. (Tr. 47).  He testified that he could not lift things in front of him, above

his head, or behind him due to pain in his left shoulder, (Tr. 48), but that he could

lift 10-15 pounds, walk for 20-30 minutes, and sit for 20 minutes before his feet start

to throb. (Tr. 50). According to Koletar, on a good day he could stand/walk for a

total of four hours, (Tr. 57), but that he has about two days a week that he is unable to shower or care for himself and his pain is near a 7 ½. (Tr. 51-52, 54). When his blood sugars are higher, his pain is worse. (Tr. 46).

The ALJ found that Koletar's statements were not entirely consistent with the medical record. (Tr. 21). The ALJ reasoned that his statements were not consistent with the documented clinical findings tending to show a stable, guarded or normal gait with no use of assistive devices, normal exam findings in bilateral upper and lower extremities, no motor or sensory deficits, except that his Achilles and plantar reflexes were noted to remain at zero. (Tr. 22). The ALJ also noted that at as of April 2019 Koletar continued to report improvement at physical therapy, that his legs were stronger, but his ankles were a little weak and feet were very sensitive, but that no physical therapy would be helpful and that his dog keeps him active and provides all the physical therapy he needs. (Id.) The ALJ also noted his appointment with his neurologist in October 2019 where Koletar stated he was doing well but continued to have constant discomfort on the bottoms of his feet and that he was having numbness and tingling in the tips of his fingers. (Id.) He noted that his thigh muscles had regained some more strength and denied any new weakness. (Id.) His physical exam findings at that visit showed he had stable gait but was unable to tandem walk. (Id.) His muscle tone was noted to be normal, sensation was intact to pinprick, light

13

touch and vibration and his reflexes were normal throughout except the plantar reflexes which were zero. (Id.) The ALJ also noted that the claimant's complaints of a left shoulder injury with ongoing pain were inconsistent with the record showing that, while he was diagnosed with left shoulder adhesive capsulitis, he reported to his orthopedist that his condition improved substantially with corticosteroid injections and his examination in July 2019 showed 170 degrees of forward elevation, 50 degrees of active external rotation and full adduction. (Id.) Koletar indicated to his orthopedist that he would continue with his exercises to improve his strength. (Id.) The ALJ also considered Koletar's activities of daily living to be inconsistent with his stated symptoms, noting that he reported activities such as he manages his own personal care, goes for walks, does laundry, shops, watches television, and cares for his dog, albeit with some limitations in performing these activities. (Tr. 23)

The ALJ then found that Koletar could perform his past relevant work as a sales representative[2] because that work did not require the performance of work-

_____

[2] The plaintiff contests the ALJ's classification of his past work, arguing that his prior work was a composite job which required more than just textile sales. Because we find there was substantial evidence to support the ALJ's finding that the plaintiff could perform both his past relevant work and other work that exists in the national economy, we need not determine whether this classification was appropriate. We note, however, that the claimant did not object to this classification nor question the vocational expert in this regard.

related activities precluded by Koletar's residual functional capacity. (Tr. 24). The ALJ noted that Koletar's past relevant work as a sales representative is classified as light exertion unskilled work and that, when comparing the claimant's residual function capacity with the physical and mental demands of this work, and based on the testimony of the vocational expert, Koletar could perform his past work as a sales representative as generally performed in the national economy. (Id.) Further, the ALJ noted that, in addition to Koletar's past relevant work, there were other jobs that existed in significant numbers in the national economy that Koletar could also perform, considering his age, education, work experience, and residual function capacity, including a marker, an office helper, and a sorter. (Tr. 25) Having reached these conclusions, the ALJ determined that Koletar had not met the demanding showing necessary to sustain his claim for benefits and denied his claim.

This appeal followed. (Doc. 1). On appeal, Koletar challenges the adequacy of the ALJ's decision arguing that the ALJ failed to adequately explain why he found the opinions of treating physician, Dr. Hepner, not persuasive and erred in his assessment of Dr. Hepner's credibility. He also argues that the RFC adopted by the ALJ did not include all Koletar's limitations because it did not include any limitations related to the use of his hands. Further, Koletar challenges the constitutional validity of the ALJ's decision arguing the appointment of Social

Security Administration Commissioner, Andrew Saul, violates separation of powers. (Doc. 13, at 5-6).

Mindful of the fact that, in this context, substantial evidence is a term of art which "means only— 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019), we find that substantial evidence supported the ALJ's findings. Therefore, as discussed in greater detail below, having considered the arguments of counsel and carefully reviewed the record, we conclude that the ALJ's decision should be AFFIRMED.

## III. <u>Discussion</u>

### A. <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F.Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial

evidence is less than a preponderance of the evidence but more than a mere scintilla.

Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not

substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a

conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir.

1993). But in an adequately developed factual record, substantial evidence may be

"something less than the weight of the evidence, and the possibility of drawing two

inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n,

383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in

this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout
> administrative law to describe how courts are to review agency
> factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——,
> 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-
> evidence standard, a court looks to an existing administrative record
> and asks whether it contains "sufficien[t] evidence" to support the
> agency's factual determinations. Consolidated Edison Co. v. NLRB,
> 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis
> deleted). And whatever the meaning of "substantial" in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial
> evidence, this Court has said, is "more than a mere scintilla." Ibid.; see,
> e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks

17

omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S.Ct. 206. <u>See Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

<u>Biestek v. Berryhill</u>, 139 S. Ct. 1148, 1154 (2019).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that [she] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. <u>See Arnold v. Colvin</u>, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); <u>Burton v. Schweiker</u>, 512 F.Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); <u>see also Wright v. Sullivan</u>, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); <u>Ficca</u>, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." <u>Zirnsak v. Colvin</u>, 777 F.3d 607, 611 (3d Cir. 2014) (citing <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 552 (3d Cir.

2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

**B.**     **Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed

impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett, 220 F.3d at 121 (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018); Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and

recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017)..

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and state that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F.Supp.2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4,

2013)). In other instances, it has been held that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F.Supp.3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting, like that presented here, where well-supported medical sources have opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when no medical opinion supports a disability finding or when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony

23

regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington, 174 F. App'x 6; Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns, 312 F.3d 113; see also Rathbun, 2018 WL 1514383, at *6; Metzger, 2017 WL 1483328, at *5.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis

for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

## C. **Legal Benchmarks for the ALJ's Assessment of a Claimant's Alleged Symptoms**

The interplay between the deferential substantive standard of review that governs Social Security appeals, and the requirement that courts carefully assess whether an ALJ has met the standards of articulation required by law, is also illustrated by those cases which consider analysis of a claimant's reported pain. When evaluating lay testimony regarding a claimant's reported degree of pain and disability, we are reminded that:

> [T]he ALJ must necessarily make certain credibility determinations, and this Court defers to the ALJ's assessment of credibility. See Diaz v. Comm'r, 577 F.3d 500, 506 (3d Cir.2009) ("In determining whether there is substantial evidence to support an administrative law judge's decision, we owe deference to his evaluation of the evidence [and] assessment of the credibility of witnesses...."). However, the ALJ must specifically identify and explain what evidence he found not credible and why he found it not credible. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir.1994) (citing *Stewart v. Sec'y of Health, Education and Welfare*, 714 F.2d 287, 290 (3d Cir.1983)); see also Stout v. Comm'r, 454 F.3d 1050, 1054 (9th Cir.2006) (stating that an ALJ is required to provide "specific reasons for rejecting lay testimony"). An ALJ cannot reject evidence for an incorrect or unsupported reason. Ray v. Astrue, 649 F.Supp.2d 391, 402 (E.D.Pa.2009) (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993)).

Zirnsak v. Colvin, 777 F.3d 607, 612–13 (3d Cir. 2014).

Yet, it is also clear that:

25

> Great weight is given to a claimant's subjective testimony only when it is supported by competent medical evidence. Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979); accord Snedeker v. Comm'r of Soc. Sec., 244 Fed.Appx. 470, 474 (3d Cir. 2007). An ALJ may reject a claimant's subjective testimony that is not found credible so long as there is an explanation for the rejection of the testimony. Social Security Ruling ("SSR") 96–7p; Schaudeck v. Comm'r of Social Security, 181 F.3d 429, 433 (3d Cir. 1999). Where an ALJ finds that there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however, the severity of which is not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

McKean v. Colvin, 150 F.Supp.3d 406, 415–16 (M.D. Pa. 2015) (footnotes omitted). Thus, we are instructed to review an ALJ's evaluation of a claimant's subjective reports of pain under a standard of review which is deferential with respect to the ALJ's well-articulated findings but imposes a duty of clear articulation upon the ALJ so that we may conduct meaningful review of the ALJ's conclusions.

In the same fashion that medical opinion evidence is evaluated, the Social Security Rulings and Regulations provide a framework under which the severity of a claimant's reported symptoms are to be considered. 20 C.F.R. §§ 404.1529, 416.929; SSR 16–3p. It is important to note that though the "statements of the individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 363

26

(3d. Cir. 2011) (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled"). It is well settled in the Third Circuit that "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence." Hantraft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (referring to 20 C.F.R. § 404.1529). When evaluating a claimant's symptoms, the ALJ must follow a two-step process in which the ALJ resolves whether a medically determinable impairment could be the cause of the symptoms alleged by the claimant, and subsequently must evaluate the alleged symptoms in consideration of the record as a whole. SSR 16-3p.

First, symptoms, such as pain or fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 16–3p. During the second step of this credibility assessment, the ALJ must determine whether the claimant's statements about the intensity, persistence, or functionally limiting effects of his or her symptoms are substantiated based on the ALJ's evaluation of the entire case record. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p. This includes but is not limited to medical signs and laboratory findings, diagnoses, and other medical opinions provided by treating or examining sources,

27

and other medical sources, as well as information concerning the claimant's symptoms and how they affect his or her ability to work. Id. The Social Security Administration has recognized that individuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p.

Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations identify seven factors which may be relevant to the assessment of the severity or limiting effects of a claimant's impairment based on a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). These factors include: activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations and restrictions. Id.; see Koppenaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1995999, at *9 (M.D. Pa. Apr. 8, 2019), report and recommendation adopted sub nom. Koppenhaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1992130 (M.D. Pa.

May 6, 2019); <u>Martinez v. Colvin</u>, No. 3:14-CV-1090, 2015 WL 5781202, at *8–9

(M.D. Pa. Sept. 30, 2015); <u>George v. Colvin</u>, No. 4:13–CV–2803, 2014 WL

5449706, at *4 (M.D. Pa. Oct. 24, 2014).

### D.    <u>Legal Benchmarks for the ALJ's Assessment of Medical Opinions</u>

The plaintiff filed this disability application in May of 2019 after a paradigm

shift in the manner in which medical opinions were evaluated when assessing Social

Security claims. Prior to March 2017, ALJs were required to follow regulations

which defined medical opinions narrowly and created a hierarchy of medical source

opinions with treating sources at the apex of this hierarchy. However, in March of

2017, the Commissioner's regulations governing medical opinions changed in a

number of fundamental ways. The range of opinions that ALJs were enjoined to

consider were broadened substantially, and the approach to evaluating opinions was

changed from a hierarchical form of review to a more holistic analysis. As one court

as aptly observed:

> The regulations regarding the evaluation of medical evidence have been
> amended for claims filed after March 27, 2017, and several of the prior
> Social Security Rulings, including SSR 96-2p, have been rescinded.
> According to the new regulations, the Commissioner "will no longer
> give any specific evidentiary weight to medical opinions; this includes
> giving controlling weight to any medical opinion." <u>Revisions to Rules
> Regarding the Evaluation of Medical Evidence</u> ("Revisions to Rules"),
> 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), <u>see</u>
> 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner
> must consider all medical opinions and "evaluate their persuasiveness"

based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the

31

different medical opinions. <u>See e.g.</u>, <u>Thackara v. Colvin</u>, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

<u>Durden v. Colvin</u>, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." <u>Cummings</u>, 129 F.Supp.3d at 214–15.

### E.   <u>This Case Will Be Affirmed.</u>

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971), and "does not mean a large or considerable amount of evidence," <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988), but rather "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Biestek v. Berryhill</u>, 139 S. Ct. 1148, 1154 (2019). Judged against these deferential standards of review, we find that substantial evidence supported the ALJ's decision that Koletar was not entirely disabled.

The plaintiff raises three arguments in support of his claim that the ALJ's determination that he was not disabled was made in error. He first alleges that the

ALJ failed to adequately explain why he found the opinions of treating physician Dr. Hepner not persuasive. In Koletar's view, the ALJ should have adopted Dr. Hepner's opinion because the evidence of record was consistent with the limitations he assigned to the plaintiff. He primarily takes issue with the way the ALJ cited to exhibits, arguing that there was no indication of what particular examinations the ALJ found inconsistent with Dr. Hepner's opinion. He also argues there was no discussion concerning other information on the record which supported Dr. Hepner's opinion.

As previously noted, Koletar's disability claim was filed after a paradigm shift in the requirements for an ALJ's assessment of medical opinion testimony. Thus, while prior to 2017 treating sources were generally entitled to more weight when considering competing medical opinions, the new regulations adopted a more holistic approach to the analysis, requiring the ALJ to evaluate all medical opinions based on their persuasiveness and explain how he or she considered the supportability and consistency of the medical opinion. Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

The ALJ noted that he found Dr. Hepner's opinion not persuasive because "the examination findings of the longitudinal record are not consistent with these rather extreme limitations," citing to exhibits 3F and 4F in support of his finding.

33

(Tr. 23). The plaintiff takes issue with the ALJ's broad citation to these exhibits arguing that a lack of explanation of why Dr. Hepner's opinions are not persuasive means the ALJ's decision lacks substantial evidence. At the outset, the ALJ did provide a comprehensive summary of the relevant portions of the treatment records, and specifically Exhibits 3F and 4F which describe his most recent encounters with his treating physicians. The ALJ summarized:

> The record shows that Dr. Lewis, neurologist, treats him for Guillain-Barre Syndrome and neuropathic pain. His most recent visit was in October 2019 where he stated he was doing well but continued to have constant discomfort on the bottoms of his feet (Exhibit 3F/p. 1). He reported also having numbness and tingling in the tips of his fingers. He stated that his thigh muscles had regained some more strength, and denied any new weakness (Exhibit 3F/p. 1-2). His physical exam findings at that visit showed he had stable gait but was unable to tandem walk. His muscle tone was noted to be normal, sensation was intact to pinprick, light touch and vibration, and his reflexes were normal throughout except the plantar reflexes which were zero (Exhibit 3F/p. 4-5). The record notes his neuropathy was likely secondary to both is diabetes as well as his nerve damage from Guillain-Barre Syndrome. He was recommended to increase Gabapentin to maximize neuropathy pain control (Exhibit 3F/p. 6).

(Tr. 22). The ALJ went on to note:

> In December 2019, his primary care physician, Dr. Hepner, saw him for his six-month follow-up (Exhibit 4F). He reported to Dr. Hepner that he felt well, his shoulder has some weakness but was improved overall and he is no longer seeing orthopedic. He stated his blood glucose levels had been increased in recent months, running high around 530 and low at 186 with an average between 200-300 (Exhibit 4F/p. 3). He noted he could not sit, or stand too long due to the neuropathy in his feet. He reported he was drinking four beers a day

34

and denied any tremulousness and agitation on holidays from alcohol (Exhibit 4F/p. 3). His physical exam findings showed he was well appearing, no gait dysfunction, no motor, sensory or reflex deficits except his ankle reflexes were noted to be mute (Exhibit 4F/p. 4). Dr. Hepner advised the claimant on the importance of diet and exercise and the need to decrease his alcohol intake (Exhibit 4F/p. 4).

The ALJ noted that these findings in particular, and the findings of the longitudinal record, were inconsistent with Dr. Hepner's opinion that:

> [Koletar] could walk one city block; could sit for more than two hours at a time for a total of six hours in an 8-hour workday, and he could stand 15 minutes at a time and stand/walk for less than two hours in an 8-hour workday. Dr. Hepner stated that the claimant must change positions and walk around every 30 minutes for five minutes at a time. He will need frequent breaks 5-10 minutes. He could lift/carry 10 pounds frequently, 20 pounds occasionally, he could rarely twist, stoop, crouch, and he could grasp, turn, and twist objects 10% of day, 0% of day for fine manipulation, 50% for reaching in front, 10% reach overhead. He would be off task 25% or more, incapable of even low stress, and would miss more than four days per month.

Having summarized the relevant longitudinal record as well as Dr. Hepner's findings, it appears the ALJ has sufficiently articulated the reasons he found Dr. Hepner's opinion unpersuasive – because it was inconsistent with the record.

Moreover, the ALJ's reasoning for finding Dr. Hepner's opinion unpersuasive was supported by substantial evidence. Despite the "rather extreme" limitations prescribed by Dr. Hepner in his opinion, the examination reports from Koletar's last appointments with his neurologist and Dr. Hepner were largely unremarkable. His neurologist reported a stable gait, normal muscle tone, intact sensation and normal

reflexes. (Tr. 1147). And at his last appointment with Dr. Hepner, it was reported that although he had continued discomfort in his feet, he felt well, was improved overall and no longer seeing orthopedic, no gait dysfunction, no motor, sensory or reflex deficits except his ankle reflexes were noted to be mute. (Tr. 1147). As of his visit with Dr. Hepner in December 2019, Koletar reported that he was still experiencing lower extremity neuropathy but ranked his pain at 3/10. (Tr. 1198). These findings are inconsistent with Dr. Hepner's opinion that Koletar would be incapable of even "low stress" work due to his limitations. (Tr. 1250).

The plaintiff also argues that the ALJ erred in failing to account for the limitations related to Koletar's use of his hands in her RFC determination. However, there is relatively little medical evidence showing Koletar would have significant manipulative limitation. The plaintiff points to his testimony that, because of numbness in his hands, he cannot use a keyboard or write about three days per week. (Tr. 58-59). He also points out that the medical records for three appointments in 2018 and 2019 show he had complained of tightness in his hands and feet. (Tr. 263, 275, 279). Finally, he points to Dr. Hepner's opinion that he could use his hands 10% of the time and could use his fingers for fine manipulations 0% of the time. (Tr. 1250).

As to Koletar's testimony regarding the limitations in his hands, at the outset, Dr. Hepfer's opinion that he could never use his fingers for fine manipulation and his hands only 10% are inconsistent with Koletar's own testimony that he had trouble writing and using a keyboard only about three days per week. Further, "[g]reat weight is given to a claimant's subjective testimony only when it is supported by competent medical evidence." Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979); accord Snedeker v. Comm'r of Soc. Sec., 244 Fed.Appx. 470, 474 (3d Cir. 2007). As the ALJ noted, despite Koletar's testimony, a physical examination in October 2018 showed no motor or sensory deficits in his upper extremities following his discharge from the hospital, (Tr. 22, 281-82), and an examination by Dr. Hepner in December 2019 showed no motor, sensory or reflex deficits. (Tr. 23, 1198). State agency medical consultants Dr. Gandhi and Dr. Mass also noted Koletar had no manipulative limitations besides limitations relating to his left shoulder injury. (Tr. 74, 85). Despite the evidence Koletar points us to, there is other, substantial evidence on the record which supports the ALJ's finding that there was no limitation in the plaintiff's use of his hands.

Thus, at bottom, it appears that Koletar is requesting that this Court re-weigh the evidence. This we may not do. See, e.g., Rutherford, 399 F.3d at 552 (quoting Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) ("In the process of

reviewing the record for substantial evidence, we may not 'weigh the evidence or substitute our own conclusions for those of the fact-finder'")). The ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.' " Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

Finally, the plaintiff contends that the ALJ's authority was constitutionally defective, in that the ALJ derives his power from the Commissioner of Social Security, and the Commissioner of Social Security was not constitutionally appointed because the removal clause violates the separation of powers. The parties agree that the removal clause violates the separation of powers to the extent it limits the President's authority to remove the Commissioner, but the Commissioner

contends that this is not a basis for setting aside an unfavorable decision denying benefits. After consideration, we agree with the rising tide of caselaw suggesting that there is no reversible error where the plaintiff has not shown a traceable injury linked to the unconstitutional removal clause. Accordingly, this argument is not a basis for a remand in this case.

The plaintiff contends that he was not afforded a valid administrative adjudicatory process because his claim was denied by an ALJ who was appointed by a Commissioner whose appointment was constitutionally defective. The plaintiff relies on the Supreme Court's decision in Seila Law LLC v. CFPB, 140 S. Ct. 2183 (2020). In Seila Law, the Supreme Court found that the Consumer Financial Protection Bureau's removal structure violated the separation of powers, as that structure essentially insulated the director of the CFPB from removal by the President. Id. at 2197. Moreover, in Collins v. Yellen, 141 S. Ct. 1761 (2021), the Supreme Court held a removal provision which allowed for the President to remove the director of the Federal Housing Finance Agency only for cause violated the separation of powers. Id. at 1783.

The Third Circuit has not addressed whether these Supreme Court decisions are applicable to the Social Security Administration. However, the SSA limits the removal of the Commissioner only for cause. See 42 U.S.C. § 902(a)(3) ("An

individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office"). Moreover, at least one court within this circuit has found that the removal provision for the Commissioner of the SSA violates the separation of powers. See Stamm v. Kijakazi, -- F.Supp.3d --, 2021 WL 6197749, at *5 (M.D. Pa. Dec. 31, 2021) (Mehalchick, M.J.) ("Applying the holdings in Seila Law and Collins here makes it clear that the provision for removal of the Commissioner of Social Security, 42 U.S.C. § 902(a)(3), violates the separation of powers").

Yet while the structure of the Social Security Act's retention provisions may foster some separation of powers concerns, what is less apparent is how those concerns provide Koletar with grounds to set aside this ALJ's decision. In this regard, other courts have taken the Collins approach and held that Social Security plaintiffs typically do not have standing to challenge the separation of powers violation, as these plaintiffs could not show that the removal clause caused them a traceable injury. Indeed, in Collins, the Supreme Court found that "whenever a separation-of-powers violation occurs, any aggrieved party *with standing* my file a constitutional challenge." Collins, 141 S. Ct. at 1780 (emphasis added). As applied to Social Security plaintiffs, one court has aptly explained:

> In Collins, the Directors of the FHFA adopted an amendment (the "Third Amendment") to certain financial agreements that "materially

40

changed the nature of the agreements" and resulted in the companies in which plaintiffs were shareholders transferring to the U.S. Treasury "at least $124 billion dollars more than the companies would have had to pay" under the prior form of the agreements. Id. at 1774. The plaintiffs in Collins thus had an identifiable basis to contend that but for the unconstitutional removal provision, the President may have removed and appointed a different Director who would have disapproved of the adoption (or implementation) of the Third Amendment. See id. at 1789.

In contrast, there is nothing showing the Commissioner or the SSA implemented new and relevant agency action that may have turned upon the President's inability to remove the Commissioner. Plaintiff has not identified any new regulations, agency policies or directives Commissioner Saul installed that may have affected her claims. Plaintiff thus fails to show how or why § 902(a)(3) removal clause possibly harmed her.

Wicker v. Kijakazi, 2022 WL 267896, at *10 (E.D. Pa. Jan. 28, 2022) (quoting Lisa Y. v. Comm'r of Soc. Sec., -- F.Supp.3d --, 2021 WL 5177363, at *7 (W.D. Wash. Nov. 8, 2021)).

Thus, following Collins, many courts in this circuit have found that Social Security plaintiffs do not have standing to make a separation of powers challenge because they cannot show a nexus between the unconstitutional removal provision and some compensable harm. See e.g., Jones v. Kijakazi, 2022 WL 1016610, at *12 (D. Del. April 5, 2022) ("Plaintiff does not articulate how the President's inability to remove the Commissioner without cause affected the ALJ's disability determination in this case"); Adams v. Kijakazi, 2022 WL 767806, at * 11 (E.D. Pa. Mar. 14, 2022)

41

("Plaintiff has failed to establish any nexus between the removal restriction and the denial of her application for benefits"); Kowalski v. Kijakazi, 2022 WL 526094, at *11 (M.D. Pa. Feb. 22, 2022) (Mehalchick, M.J.) ("There is no allegation suggesting a direct nexus between the adjudication of Kowalski's disability claim by the ALJ and the alleged separation of powers violation in the removal statute that applies to the Commissioner"); Mor v. Kijakazi, No. CV 21-1730 (JMV), 2022 WL 73510, at *5 (D.N.J. Jan. 7, 2022) (Plaintiff fails to point to any connection between the Commissioner's removal under Section 902(a)(3) and the ALJ's decision (or any other action in this case). As a result, the requisite nexus is not met").

In the instant case, the plaintiff simply contends that he was not afforded a valid administrative adjudicatory process because the removal structure for the Commissioner of SSA is unconstitutional. However, as this recent caselaw illustrates, much more is needed than a generalized assertion that the unconstitutionality of the removal clause requires a remand. Rather, the plaintiff must show that the removal structure itself caused him harm. Koletar makes no such allegation or showing here, nor can he. Accordingly, his argument that his case should be remanded for a de novo hearing before a new ALJ fails. Therefore, we will affirm the Commissioner's decision.

An appropriate order follows.

/s/ *Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: August 23, 2022